**James C. HORNADAY, a District Court Judge for the State of Alaska, Appellant,**

**v.**

**Mark C. ROWLAND, Presiding Judge for the Third Judicial District, State of Alaska, and State of Alaska, Appellees.**

No. 7810.

Supreme Court of Alaska.

Dec. 2, 1983.

---

Henry J. Camarot, Camarot, Sandberg & Hunter, Anchorage, and Wallace Rudolph, Tacoma, Wash., for appellant.

Jeffrey M. Feldman, Gilmore & Feldman, Anchorage, for appellee Mark C. Rowland.

Norman C. Gorsuch, Atty. Gen., Juneau, Carolyn E. Jones, Asst. Atty. Gen., Anchorage, for appellee State of Alaska.

Before RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

On December 3, 1982, an administrative order was issued by Mark C. Rowland, the Presiding Superior Court Judge for the Third Judicial District, directing that District Judge James C. Hornaday move his office from Homer to the District Court offices in Anchorage. The basis of Judge Rowland's decision was his conclusion that "Judge Hornaday was being pre-empted [sic] an unusual amount of times in criminal cases set for trial." [1]

Judge Rowland wrote to Judge Hornaday on December 16 and offered to meet with Hornaday and his counsel to discuss the permanent transfer decision. Judge Hornaday responded through counsel by filing a motion which requested a more formal hearing than that proposed by Rowland and asked that the proceeding be conducted by a judge other than Judge Rowland.[2] Judge Rowland informed Hornaday that he had decided to proceed through an informal hearing. Judge Rowland himself conducted the hearing.

Present at the hearing were Hornaday and his counsel, Henry Camarot. The hearing consisted primarily of a discussion between Judge Rowland and Camarot concerning the transfer decision. The focus of discussion was the underlying fact pattern: how often Hornaday had been subject to peremptory challenge, the monetary cost of peremptory challenge to the court system, how often other judges were peremptorily challenged as compared to Hornaday, etc.

Following the hearing, Judge Rowland wrote to Camarot that he had considered Hornaday's request to revoke the administrative order providing for Hornaday's transfer to Anchorage but that he believed such a revocation would be inconsistent with his responsibilities as presiding judge.

---

1. This conclusion was based in part upon an investigation requested by Judge Rowland and performed by Area Court Administrator Albert H. Szal. Mr. Szal reviewed the Homer trial calendars for the period of March to November 1982 and found that Judge Hornaday had been peremptorily challenged in 82.5% of his criminal cases set for trial. The apparent reason for the high rate of peremptory challenges was Judge Hornaday's public announcement that he would uniformly impose stiff sentences upon defendants convicted of drunken driving. Following a ruling by Presiding Judge Rowland

that Hornaday's policy supplied an appropriate basis for a challenge for cause by defense attorneys, Hornaday rescinded his announcement. Despite this rescission, Hornaday's peremption rate tripled.

2. Hornaday asserted that "[I]n this particular case, it appears this Court is performing the function of judging the investigation and the decision." Hornaday also apprised Judge Rowland that he anticipated calling "as many as 20 witnesses."

Judge Rowland stated that, "It remains my belief that the unfortunate peremption rate of Judge Hornaday effectively cripples his ability to serve the [Homer] area as a judicial officer.... To continue to cover for Judge Hornaday with judges from other areas results in unwarranted expense and is unduly disruptive of the calendar in those other areas which are thereby affected." Judge Rowland noted that his decision was not predicated upon any conclusion that Judge Hornaday had acted improperly or had failed in the responsibilities of his office. Nor was it based upon any judgment of whether the peremptory challenges of Hornaday were being executed fairly. Judge Rowland stated that: "It is the bare fact of their exercise with which I have been concerned."

Thereafter Judge Hornaday filed a complaint against Presiding Judge Rowland in the superior court seeking a declaratory judgment that Rowland's transfer order was invalid and an injunction against its enforcement.[3] Hornaday asserted that the order lacked any basis in statute or administrative rule; that it violated the doctrine of separation of powers; that it was a violation of his right to substantive due process; and that the administrative procedures followed by Judge Rowland violated Hornaday's right to procedural due process. Further, Hornaday challenged the facial validity of AS 22.20.022, the peremptory challenge statute, principally on the ground of a second separation of powers theory.[4]

After a hearing the superior court entered an oral ruling granting summary judgment to Presiding Judge Rowland and to the state. In its ruling the superior court held: (1) that Judge Rowland had the authority to transfer Third Judicial District judges anywhere within the Third Judicial District; (2) that the principle of separation of powers was not contravened by the transfer because judges are appointed by the executive to an entire district rather than to a specific locality; (3) that Judge Hornaday's due process rights were not violated because Hornaday had no cognizable property interest in remaining in Homer and that, even if Hornaday did have such an interest, the procedures followed by Presiding Judge Rowland were constitutionally adequate; and (4) that AS 22.20.022 had previously been held constitutional by the Alaska Supreme Court. Judge Hornaday appeals all of these rulings.[5]

## I.

### *Judge Rowland's Authority to Issue the Transfer Order.*

██ Judge Hornaday argues that the statutes and court rules concerning the powers of a presiding judge and the assignment of district court judges do not authorize Presiding Judge Rowland's permanent intra-district transfer of Judge Hornaday from Homer to Anchorage. We agree.

The powers of presiding judges are set forth in AS 22.10.130 and AS 22.15.190. Judge Hornaday argues that the presiding judge's power to make assignments as described by these statutes is limited to temporary transfers. Judge Rowland asserts that the statutes do not impose such a limitation.

AS 22.10.130 provides:

*Appointment and duties of presiding— judges.* The chief justice of the supreme court shall designate a presiding judge

---

**3.** Hornaday simultaneously filed a complaint in federal district court preserving federal constitutional claims for relief under 42 U.S.C. § 1983. Only state law claims were brought before the superior court, and are presented on appeal.

**4.** Because the constitutionality of a state statute was called into question the state intervened pursuant to Civil Rule 24(c). The state's participation at trial and on appeal is limited to questions of the validity of AS 22.20.022.

**5.** Because we base our decision on the ground that Presiding Judge Rowland had no authority to make a permanent transfer of Judge Hornaday from Homer to Anchorage, we do not reach Judge Hornaday's claim that the administrative procedures created by Judge Rowland violated Hornaday's rights to procedural due process.

for each district. The presiding judge shall in addition to regular judicial duties (1) assign the cases pending to the judges made available within the district, (2) supervise the judges and their court personnel in the carrying out of their official duties within the district, and (3) expedite and keep current the business of the court within the district.

AS 22.15.190 provides:

*Assignment of district judges and magistrates.* Each district judge and each magistrate shall hold court at such times and places as are assigned by the presiding judge of the superior court of the district. The presiding judge in any judicial district may assign any district judge or magistrate within the district to serve temporarily in any other judicial districts. Rules and procedures for temporary assignment including the emergency situation where a superior court judge is not readily available to assign a district judge or magistrate shall be as prescribed by the supreme court.

Section 130 describes the general duties of a presiding judge. Subparts (1), (2), and (3) describe functions which arguably were served by Judge Rowland's transfer order in this case. Section 130 does not, however, expressly create a permanent transfer power. Section 190 comes closer to speaking to the transfer issue. Its first sentence gives the presiding judge power to assign "times and places" where each district judge "shall hold court." Judge Rowland claims that this is a clear grant of a permanent transfer power. Judge Hornaday responds that the presiding judge's ability to assign "places" is limited to decisions such as which building and which courtroom will be used. He further argues that the second sentence of section 190, providing that inter-district transfers will be temporary, necessarily implies that intra-district transfers must also be temporary.

We do not agree with Judge Rowland that section 190 is a clear grant of a perma-

nent transfer power in the presiding judge. The first sentence is certainly subject to the construction urged by Judge Hornaday that it deals with routine administrative detail. Our reading is that section 190 does not contemplate the eventuality of permanent intra-district transfers, and that it does not furnish the requisite basis for the reassignment made by Judge Rowland in this case.

We next consider Administrative Rules 24 and 27 dealing respectively with the assignment of judges and the duties of the presiding judge in each district.[6] Rule 24 provides in pertinent part:

(a) *Assignments Within Judicial Districts.* Assignment of a judicial officer from the court location of his or her residence to locations within the same judicial district shall be made by the presiding judge of the judicial district or by his designee. In making such assignments, due regard shall be had of the status of accumulated calendars of the courts in the district to the end that judicial officers are assigned to such courts as needed in order to keep the calendars current.

(b) *Temporary Assignments in Other Judicial Districts.*

(1) When the volume of judicial business in the superior or district court in any judicial district warrants the temporary assignment thereto of one or more judicial officers from another judicial district, the presiding judge in the judicial district requiring such temporary assignment shall so advise the administrative director, giving details as to the reasons for the assignment, the length of time and the location of the temporary assignment.

(2) The administrative director shall thereupon determine the availability of judicial officers in other judicial districts and make such assignments as may be necessary.

. . . . .

---

**6.** The Administrative Rules are promulgated by the supreme court pursuant to Article IV, section 15 of the Alaska Constitution.

(d) *Length of Assignment.* A single temporary assignment of a judicial officer to another judicial district may not exceed 90 days, unless the judicial officer consents to the additional assignment. Assignments in excess of 90 days or any assignment made without the consent of the assigned judicial officer may be made only by special order of the chief justice.

.　　.　　.　　.　　.

(f) In this rule, "judicial officer" means a superior court judge, district court judge, or magistrate.

.　　.　　.　　.　　.

Rule 27 provides in pertinent part:
*Presiding Judge.*

(a) The chief justice shall designate one judge from each judicial district to be presiding judge of that district. A judge designated as presiding judge shall hold office as such for a term of one year and shall be eligible to succeed himself thereafter.

(b) In addition to regular judicial duties a presiding judge shall, within his or her judicial district:

(1) Supervise the assignment of cases pending to the judges;

(2) Supervise the administrative actions of judges and court personnel;

(3) Expedite and keep current the business of the courts;

(4) Review and recommend budgets; and

(5) Review the operations of all trial courts to assure adherence to statewide court objectives and policies.

(c) A presiding judge may:

(1) Assign judges and magistrates to locations within their district of residence as necessary to maintain balanced workloads or to expedite the business of those courts;

.　　.　　.　　.　　.

(3) Perform any other duties and exercise any other powers as may be provided by law or by these rules.

From a reading of the foregoing it is apparent that the rules contain conflicting signals regarding the authority of the presiding judge to order a permanent transfer. Rule 24(a) could possibly be read to place such power in the presiding judge. Rule 27(c)(1) is subject to the same reading. Further, as Judge Rowland points out, the difference between the headings of subsection (a) and (b) of Rule 24 is striking, namely, "*Assignments Within Judicial Districts.*" as opposed to "*Temporary Assignments in Other Judicial Districts.*" Judge Rowland contends that the absence of the word "temporary" from any part of Rule 24(a) indicates that permanent intra-district assignments by a presiding judge are authorized, whereas permanent inter-district assignments are not. Judge Hornaday disagrees. He notes that the second sentence of Rule 24(a) states that the assignment power must be exercised with "due regard" for calendar considerations. Based upon the premise that proper calendaring involves only the temporary movement of judges, Hornaday asserts that only temporary assignments are contemplated.[7]

 We think that Rule 24(d) demonstrates the incorrectness of Judge Rowland's interpretation. Rule 24(d) deals with "Length of Assignment." (It does not deal with "Length of *Temporary* Assignment.") The second sentence of the subsection is dispositive of this case:

Assignments in excess of 90 days or any assignment made without the consent of the assigned judicial officer may be made only by special order of the chief justice.

Rule 24(d) demonstrates that all judicial assignments by a presiding judge, whether "temporary inter-district" or "intra-district" in character, are subject to time limi-

---

**7.** In addition, Hornaday suggests that it makes no sense for Rule 24(b) to "protect" judges from the dislocation of a permanent inter-district transfer, yet fail to provide the equivalent "protection" against intra-district transfers. We think it is incorrect to assume that the assignment provisions of Rule 24 were written for the protection of judges. The obvious reason for a restrictive rule regarding the presiding judge's authority to make inter-district assignments is that his administrative authority does not extend beyond his own district.

tations. Assignments for more than 90 days, or any assignment made without the assent of the assigned judge, cannot be made by a presiding judge. Hornaday's assignment was for more than 90 days, and was certainly made without his consent. The plain meaning of Rule 24(d) is that such an assignment may not be made by the presiding judge.

Alternatively we reach this same holding for the following reasons. First, we have previously held that AS 22.15.190 is not a grant of a permanent transfer power in the presiding judge. AS 22.15.190 deals with routine administrative details and does not authorize permanent intra-district transfers. Second, we agree with Judge Hornaday's contention that provisions of Administrative Rule 24(a) relating to transfers within districts as needed "to keep the calendars current" imply that assignments are to be temporary—made to promote the smooth flow of day-to-day business rather than to rearrange the staffing of the district. Similarly, Rule 27(c) empowers the presiding judge to assign judges to locations within the district "as necessary to maintain balanced workloads or to expedite the business of those courts." Again, the concern with balanced workloads and expedited business suggests that the presiding judge may temporarily relocate judges within the district to keep business flowing smoothly, but not that he may permanently reassign them.

We are of the view that Judge Rowland's actions were significantly different from the essentially functional acts authorized by Administrative Rules 24 and 27. Given the importance in fact (even if not explicitly acknowledged in the Administrative rule) of the location of an assignment within a district,[8] power to change that location per-

manently should not be read into these rules.

Accordingly, we reverse the superior court decision in this case insofar as it found the transfer of Judge Hornaday was authorized under the applicable statutes and Administrative Rules. We hold that Presiding Judge Rowland's administrative order of December 3, 1982, is void and of no effect.

## II.

*Separation of Powers—Judicial Power and the Executive Power of Appointment.*

In order to invoke the doctrine of separation of powers, actions by two branches of government must be involved. In Judge Hornaday's first separation of powers argument, the actors are from the executive and judicial branches. In brief, Hornaday contends that the governor's appointive authority includes a "place power," and that the governor appointed Hornaday to serve specifically in Homer.[9] Presiding Judge Rowland, in moving Hornaday to Anchorage, thus reached from judicial territory into the executive domain. Judge Rowland replies that Hornaday's appointment was to the entire Third Judicial District, encompassing Homer and Anchorage, and that there is no legal support for the argument that "judicial appointments are to be made on a town-by-town or city-by-city basis."

Judge Rowland observes that the constitution and statutes do not provide that district judgeships, or judgeships of any sort, are assigned on a city-by-city basis. Rather, the "significant unit of court administration" as established by the constitution is the judicial district.[10] Judge Rowland also

---

**8.** The importance of a district judge's location within a district is acknowledged in the reference in Administrative Rule 24(a) to the "court location" of [a judge's] residence.

**9.** On November 2, 1976, Governor Hammond wrote Hornaday that, "It is my pleasure to inform you of your appointment to the District Court in the Third Judicial District at Homer."

**10.** Article IV, section 1 states that, "Judicial districts shall be established by law." Beyond this straightforward command that there shall be judicial districts, however, the constitution is silent regarding the import to be attached to the fact that the state is divided into districts. Article IV, section 6, for example, dealing with retention of judges, does not specify that the vote will be held on a district-wide basis. AS 15.35.080 currently provides that retention of

**1340**

points out that the division of governmental powers with respect to the district courts is a matter of statute in this case. *See* AS 22.15.170. Rowland thus contends that the governor's appointment power "must be sensibly construed in conjunction with the other statutes enacted by the legislature giving broad administrative and assignment authority to the court and the presiding judge."

Hornaday suggests that the statutes governing the district courts "adopt" the constitutional scheme for the supreme and superior courts. Furthermore, he contends that the governor's constitutional authority to appoint judges includes the ability to designate their location in a particular city.

There are similarities between the statutory and constitutional schemes governing the district courts and the supreme and superior courts respectively. In particular, AS 22.15.170(a) provides that the governor shall appoint from nominees provided by the judicial council. AS 22.15.195 provides for retention elections. These provisions find constitutional analogues in article IV, section 5, and article IV, section 6 of the Alaska Constitution. In other respects, however, the district courts differ significantly from the "constitutional courts," i.e., the superior courts and the supreme court.[11]

Article IV, section 4 of the Alaska Constitution states that, "Judges of [courts other than the supreme and superior courts] shall be selected in a manner, for terms, and with qualifications prescribed by law." There is no dispute that the district courts come within this provision. AS 22.15.020(c) provides that "The number of district court judges ... within each judicial district may be increased or decreased by rule of the supreme court." This court enjoys no similar authority with respect to the superior courts. Article IV, section 3 of the Alaska Constitution places sole power in the legislature to set the number of superior court judges within the state.[12] *See* AS 22.10.-120.[13]

AS 22.15.020(c) demonstrates the legislature's intention that the judicial branch retain a special measure of power over the district courts which it does not possess with respect to higher courts. Judge Rowland goes so far as to assert that AS 22.15.020(c) is dispositive of this case. If the supreme court has the power to abolish the district court seat in Homer and add another in Anchorage, he asserts, it necessarily has the ability to move a district court judge from Homer to Anchorage.[14]

It is not necessary to accept the whole of Judge Rowland's argument on this point to

superior court judges will be decided by the voters of the judge's judicial district; AS 15.-35.100(b) sets forth the same rule for district court judges. Similarly, article IV, section 3 provides that "The number of [superior court] judges may be changed by law," but does not expressly give the legislature the power to specify how many judges there will be in each district. Such specifications do appear in the statutes, *see* AS 22.10.120, but are not mandated by express constitutional language.

11. *See Lopez v. Anchorage,* 597 P.2d 146, 148 (Alaska 1979) (Article I, section 11 applies differently to superior courts and district courts because of non-constitutional status of district courts). *Delahay v. State,* 476 P.2d 908 (Alaska 1970), *appeal dismissed,* 402 U.S. 901, 91 S.Ct. 1381, 28 L.Ed.2d 642 (1971), contains a history of the district courts since their creation by the legislature in 1959. *Id.* at 908–10. Originally, the first "district magistrate judges" were appointed by the presiding judge of their judicial district, and served at the presiding judge's pleasure. SLA 1959 ch. 184, § 12, formerly codified as AS 22.15.170. In 1966 the

statute was amended to withdraw removal power from the presiding judge, and district court judges became required to stand for retention before the voters of their district. SLA 1966, ch. 138, § 1, codified as AS 15.35.100. In 1967 appointive power was transferred to the governor, who now appoints from among nominees provided by the judicial council. AS 22.-15.170 (SLA 1967, ch. 117 § 2).

12. Article IV, section 3 provides that: "The superior court shall be the trial court of general jurisdiction and shall consist of five judges. The number of judges may be changed by law."

13. *See also* AS 22.10.140, affording special limitations upon assignments of superior court judges not applicable to district court judges.

14. One major problem with Judge Rowland's argument on this score is that AS 22.15.020(c) creates power in the supreme court, not the presiding judge. Unless a permissible delegation of this power to Presiding Judge Rowland were found in this case, the statute cannot provide the basis for decision.

find that there is a crucial structural difference between district courts and the constitutional courts. In the absence of a more persuasive argument from Judge Hornaday, it is difficult to see how his transfer implicates the constitutional allocation of powers among the separate branches. AS 22:15.-170(a), relating specifically to the district courts, states:

> The governor shall fill a vacancy or appoint a successor to fill an impending vacancy in an office of district judge within 45 days after receiving nominations from the judicial council by appointing one of two or more persons nominated by the council for each actual or impending vacancy. The appointment to fill an impending vacancy becomes effective upon the actual occurrence of the vacancy.

Nowhere in either provision is it stated that the governor's appointment is place specific. We decline to hold that the "place power" may be implied into the constitution in the absence of supporting language.

 We thus hold that a permanent intra-district transfer of a district court judge by a judicial officer does not contravene the principle of separation of powers. We are unpersuaded that the administration of the district courts presents constitutional concerns relating to the apportionment of power among the branches of government. In addition, we conclude that there is no constitutional power residing in the executive to designate the particular location where a district court judge will serve.

### III.

### Constitutionality of the Peremptory Challenge Statute.

 There is no dispute that the present lawsuit would not have arisen but for the operation of the peremptory challenge statute, AS 22.20.022.[15] The sole reason relied upon by Presiding Judge Rowland in issuing his transfer order was the high peremption rate of Judge Hornaday. We thus find that Judge Hornaday has standing to contest the validity of AS 22.20.022 and that resolution of his claim is appropriate at this time. *See Carpenter v. Hammond,* 667 P.2d 1204 (Alaska 1983); *State v. Lewis,* 559 P.2d 630 (Alaska 1977), *appeal dismissed,* 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1073 (1977).

Hornaday attacks the constitutionality of Alaska's peremptory challenge statute on several grounds, which we will consider in turn.

### A. Separation of powers doctrine.

Constitutional attacks upon peremptory challenge statutes are almost universally predicated upon the separation of powers doctrine. *See* Note, *Peremptory Challenges of Judges in the Alaska Courts,* 6 U.C.L.A.—Alaska L.Rev. 269, 291–92 (1977), cited approvingly in *Tunley v. Municipality of Anchorage School District,* 631 P.2d 67, 71 n. 2 (Alaska 1981). The statutes are challenged primarily on the ground that they represent undue legislative interference with the judiciary's right to assign judges, *Austin v. Lambert,* 11 Cal.2d 73, 77 P.2d 849 (1938), and with the judiciary's rule-making power, *Channel Flying Inc. v. Bernhardt,* 451 P.2d 570, 574–76 (Alaska 1969).

This facet of Hornaday's argument is not a matter of first impression in this jurisdiction. In *Channel Flying, supra,* we explicitly rejected a separation of powers attack on AS 22.20.022. In that case it was noted that Alaska's statute required an affidavit of prejudice or bias, which distinguished it

---

**15.** AS 22.20.022 provides, in relevant part:

(a) If a party or a party's attorney in a district court action or a superior court action, civil or criminal, files an affidavit alleging under oath the belief that a fair and impartial trial cannot be obtained, the presiding district court or superior court judge, respectively, shall at once, and without requiring proof, assign the action to another judge of the appropriate court in that district, or if there is none, the chief justice of the supreme court shall assign a judge for the hearing or trial of the action. The affidavit shall contain a statement that it is made in good faith and not for the purpose of delay.

from those cases where peremptory challenge statutes had been invalidated.[16]

The cases which have held disqualification statutes invalid have recognized that where in a statute an affidavit of prejudice or bias is required in order to disqualify a judge, the statute would successfully withstand an attack on its validity. The reason is that where no affidavit is necessary, a judge may be disqualified for good cause, bad cause—or no cause at all. But where an affidavit is required, the assertion of bias or prejudice under oath is at least some showing or an imputation of the fact that the judge is disqualified and this is sufficient to save the statute from successful attack on constitutional grounds. A litigant is entitled to a fair hearing before a tribunal which is disinterested, impartial and unbiased, [*Nelson v. Fitzgerald*, 403 P.2d 677, 679 (Alaska 1965)] and a statute which affords him that right by providing some means for showing bias or lack of impartiality does not offend the principle of separation of powers of government.

451 P.2d at 575 (footnotes omitted).

■■■ After deciding *Channel Flying*, the Alaska Supreme Court promulgated Civil Rule 42(c) and Criminal Rule 25(d), which permit peremption without submission of an affidavit or specification of grounds. Since this court itself broadened the peremption rights embodied in AS 22.20.022, it is difficult to conceive of how the statute could be deemed to violate the separation of powers doctrine by intruding upon judicial policy and rule-making prerogatives. *See* Note, *Peremptory Challenges, supra*, at 293–96.

**B. Interference with ability to carry out oath of office.**

■■ Hornaday argues that the peremptory challenge statute hinders the ability of the judiciary to fulfill its obligation to maintain its independence. He relies upon arguments addressed in *State v. Holmes*, 106 Wis.2d 31, 315 N.W.2d 703, 723 (1982), where the Wisconsin Supreme Court quoted the following passage from the decision of the lower court.

Under these [peremptory challenge] statutes a judge lives knowing, perhaps not caring, that at any time the Bar can exercise its potential power and literally force out that judge of ever trying another case in the county. . . . No judge will admit to being influenced by it. No judge honest with himself will deny that he is not bothered by it.

Should we, as an independent judiciary, have to live under that cloud? There is a subtle threat to conform to the Bar's standards of practice . . . . The result is the loss of the independence of the judiciary. . . . The judge is faced with situations where he cannot fulfill his oath of office because he is prevented from doing so by the whim and caprice of counsel.

315 N.W.2d at 723, *quoting* Memorandum Decision of Judge Weisel at 8. Although the Wisconsin court was sympathetic to the

---

**16.** *Compare Austin v. Lambert,* 11 Cal.2d 73, 77 P.2d 849 (1938) (court struck down statute permitting peremptory challenge without submission of affidavit alleging bias or other reason for disqualification, finding that a "reading of those [peremption] statutes [of other states] discloses that without exception they provide for some showing of disqualification by *affidavit.*" 77 P.2d at 851) *with Johnson v. Superior Court,* 50 Cal.2d 693, 329 P.2d 5, 9 (1958) (upholding statute requiring submission of affidavit). A statute similar to that struck down by the California court in *Austin* was recently upheld by the Wisconsin Supreme Court in *State v. Holmes,* 106 Wis.2d 31, 315 N.W.2d 703 (1982), on the following grounds:

the objective of the peremptory substitution statute and of the pre-1969 affidavit of preju-

dice law is the same: to preserve the defendant's right to a fair trial and to ensure the orderly administration of justice . . . . The legislature's elimination of the requirement of an affidavit of prejudice in 1969 is merely a change in the method of accomplishing the legitimate legislative objective of assuring fair trial, not a change of objective.

315 N.W.2d at 716 (citations omitted). The *Holmes* court considered and rejected arguments that the statute violated separation of powers principles, concluding that there had been "no showing . . . beyond a reasonable doubt," that it materially impaired or practically defeated the proper functioning of the judicial system. 315 N.W.2d at 721–22.

concerns of the lower court, it concluded that they did not rise to a sufficient level to warrant invalidation of the statute. It is noteworthy that the Wisconsin statute was upheld even though it permitted peremptory challenges without requiring affidavits that they were being exercised for cause. *See* W.S.A. 971.20, set out at 315 N.W.2d at 705 n. 1. Thus, it was potentially far more disruptive of judicial independence than AS 22.20.022, as will be discussed *infra*. *See generally Channel Flying, Inc. v. Bernhardt,* 451 P.2d 570, 575 (Alaska 1969).

The California Supreme Court dismissed a similar allegation in *Solberg v. Superior Court,* 19 Cal.3d 182, 137 Cal.Rptr. 460, 561 P.2d 1148 (1977), when it considered a constitutional attack upon a statute similar to AS 22.20.022. The California statute permitted peremptory disqualification upon a motion supported by an affidavit of prejudice. Upholding the statute against charges, *inter alia,* that it had been "invoked to intimidate judges generally and in certain cases even to influence the outcome of judicial election campaigns," 561 P.2d at 1156, the court noted that

> a case can be made for the proposition that some of the abuses condemned by amici judges are self-limiting. For example, a lawyer who practices in a single-judge court must realize that an improper use of section 170.6 in one or more cases risks antagonizing the very judge before whom he must inevitably appear in all other cases he has and will have in that court. [T]he lawyer's self-interest should give him ample incentive to dissuade his client from demanding an undutified disqualification.

561 P.2d at 1157.[17] Thus, the small size of a judicial district becomes a double-edged sword—while it may permit lawyers to obtain some "power" over the single judge, it also places the bar in a position of dependence upon that same person. It seems reasonable to conclude that these countervailing pressures will generally neutralize each other in the long run, and that the judiciary's ability to carry out its oath of office will not be seriously compromised.

**C. Rationality of means/ends relationship.**

■ The purpose of AS 22.20.022 was articulated by this court in *Channel Flying, Inc. v. Bernhardt,* 451 P.2d 570 (Alaska 1969):

> [T]he statute . . . creates and defines a right—the right to have a fair trial before an unbiased and impartial judge.

451 P.2d at 576 (footnote omitted). Hornaday argues that the statute was invoked by litigants who objected to his sentencing policy rather than to his method of conducting the trial, an "abuse" which the statute permitted because it was not drafted sufficiently narrowly. He concludes that the nexus between broad peremptory challenge rights granted by the statute and its underlying objective of ensuring fair trials is too tenuous to withstand constitutional scrutiny.

This argument merits little serious consideration, since it is predicated upon an illusory dichotomization of "sentencing" and "trial." It is self-evident that sentencing is one of the most critical components of every criminal trial which culminates in a conviction. Neither AS 12.55.005 et seq. nor Crim.R. 32 support Hornaday's proposed distinction between "sentencing" and "trial".[18]

---

17. *See also State v. District Court,* 180 Mont. 317, 590 P.2d 1104 (1979) where the court recognized that "[a] principal area of abuse" in the exercise of the right of peremptory challenge concerned "mass disqualifications of an individual district judge in every criminal case by an individual attorney, law firm or staff," but without further documentation refused to strike down the statute on those grounds. 590 P.2d at 1108.

18. *See, e.g., Gadsen v. United States,* 223 F.2d 627 (D.C.Cir.1955), *cert. denied,* 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827 (1956), where the defendant successfully challenged a criminal sentence on grounds of incompetent assistance of counsel at sentencing. His trial counsel's law partner had appeared at sentencing with the defendant in place of the attorney who had represented him throughout trial. Judge Bazelon, writing for the court, concluded that "no . . . argument could prevail" that the defendant received effective representation of counsel at

**D. Damage to reputation.**

Hornaday argues that his reputation was damaged as a result of the operation of the peremptory challenge statute and that he should have been afforded due process protection prior to the infliction of such harm. He cites no judicial authority in support of this contention and we have found no cases where this argument was raised. Further, the record is decidedly deficient in demonstrating that Judge Hornaday's reputation has been damaged due to the operation of the preemption statute.

■■■■■■ It is well-established that this court will take cognizance of a due process claim only where there is an alleged deprivation of a sufficient "liberty" or "property" interest to warrant constitutional protection. *Horowitz v. Alaska Bar Ass'n,* 609 P.2d 39, 42 (Alaska 1980). Without further showing regarding the importance of the alleged interest at stake, we dismiss this argument on the ground that the asserted interest does not merit constitutional protection.[19]

**E. Conclusion.**

In view of the promulgation of Civ.R. 42(c) and Crim.R. 25(d), we find Hornaday's separation of powers argument unpersuasive. AS 22.20.022 represents a permissible accommodation of the due process rights of individual litigants and the ability of judges and the judicial system to function efficiently. Further, this court by rule has endorsed the concept of peremptory challenges without cause, rendering highly tenuous a contention that AS 22.20.022 represents an unjustified legislative encroachment upon the judiciary. We thus reaffirm

our decision in *Channel Flying* upholding the validity of AS 22.20.022.

The decision below is REVERSED in part and AFFIRMED in part.

COMPTON, J., concurs.

BURKE, C.J., and MOORE, J., not participating.

COMPTON, Justice, concurring.

I agree with the court's holding that the transfer of Judge Hornaday was not authorized by statute or administrative rule, but I disagree with the analysis of the primary holding in Section I. I believe that the court's reliance on the second sentence of Administrative Rule 24(d) to demonstrate that presiding judges are not authorized to make intra-district transfers is misplaced. The court's interpretation requires an assumption that the first and second sentences of Administrative Rule 24(d) refer to entirely different subjects. The first sentence of section (d) refers by its terms to temporary assignments of judicial officers to *other* judicial districts, which may not exceed 90 days. I believe that the second sentence refers to the subject matter of the first sentence. It thus provides that those intra-district assignments which do exceed 90 days, as well as assignments—whether of more or less than 90 days—to which the judge involved does not consent, may be made only by special order of the chief justice. I believe that the sentence makes sense as a whole only if it is read as referring to a single subject: *inter*-district transfers of judges.

---

the sentencing hearing. 223 F.2d at 631. He observed that

> [c]onceivably, by intensive preparation, counsel entering the case for the first time at the sentencing stage could make an effective plea in mitigation. But here there is no [such] showing ...
> If substitute counsel is present [at sentencing] and if the trial judge chooses not to postpone the hearing, he has, we think, the affirmative duty to ascertain whether the substituted counsel is qualified to give effective representation.

223 F.2d at 631–32. *Gadsen* implicitly recognizes the principle of significant continuity between trial and sentencing that undermines Hornaday's argument that the two should be dichotomized for purposes of ascertaining the goal of the peremptory challenge statute.

**19.** *See Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (reputation alone, apart from more tangible interest, is not by itself "liberty" or "property" sufficient to invoke the procedural protection of the due process clause).

Based on this interpretation, I believe that Administrative Rule 24(d) is irrelevant to the case at hand. However, as the majority acknowledges in its alternative ruling, it is not necessary for a holding that Judge Rowland's action was not authorized. I agree with the alternative ruling and with all other aspects of the court's opinion.